**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **LAURA L.[1]**, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 7:20-cv-00040** |
| | ) | |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Laura L. ("Laura") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42. U.S.C. §§ 401–433, 1381–1383f; R. 247–54. Laura alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) assess her mental impairments; (2) determine her RFC using a function-by-function analysis; and, (3) assess her allegations regarding her symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment, Dkt. 19, and **DENYING** Laura's motion for Summary Judgment, Dkt. 13.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

the Commissioner's conclusion that Laura failed to demonstrate that she was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Laura filed for DIB and SSI in January and February 2017, respectively, claiming her disability began on October 21, 2015, due to osteoarthritis, fibromyalgia, bipolar disorder, attention-deficit hyperactivity disorder ("ADHD"), panic attacks, depression, difficulty getting along with others, inability to handle stress, and right ankle pain. R. 247–50, 273–84. Laura's

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

date last insured was December 31, 2019; thus, she must show that her disability began on or

before this date and existed for twelve continuous months to receive DIB. 42 U.S.C.

§§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency

denied Laura's applications at the initial and reconsideration levels of administrative review.

R. 102, 138. On October 24, 2018, ALJ Thomas Erwin held a hearing to consider Laura's claims

for DIB and SSI.[3] R. 39–65. Counsel represented Laura at the hearing, which included testimony

from vocational expert Robert Jackson. R. 15. On December 18, 2018, the ALJ entered his

decision analyzing Laura's claims under the familiar five-step process[4] and denying her claim

for benefits. R. 12–38.

The ALJ found that Laura was insured at the time of the alleged disability onset and that

she suffered from the severe impairments of "osteoarthritis and fibromyalgia, with history of

right ankle fracture; obesity; cyclic vomiting; asthma; and depression/bipolar disorder." R. 18.

The ALJ determined that these impairments, either individually or in combination did not meet

or medically equal a listed impairment. Id. The ALJ specifically considered listing 1.02 (major

joint dysfunction), 3.03 (asthma), 5.01 (digestive system), and 12.04 (depressive, bipolar, and

related disorders). The ALJ also considered SSR 02–1p, see Titles II and XVI: Evaluation of

---

[3] ALJ Erwin heard and denied Laura's previous claim on October 20, 2015. R. 66–85.

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

Obesity, SSR 02–1p (S.S.A. September 12, 2002),[5] and SSR 12–2p, see Titles II and XVI:

Evaluation of Fibromyalgia, SSR 12–2p (S.S.A. July 25, 2012).[6] The ALJ found that regarding

her mental impairments, Laura had moderate limitations in understanding, remembering, and

applying information and concentrating, persisting, or maintaining pace, and mild limitations in

interacting with others and adapting or managing oneself. R. 19–21.

The ALJ concluded that Laura retained the residual functional capacity ("RFC") to

perform a limited range of light work. R. 22. Specifically, Laura can only occasionally kneel,

crawl, crouch, stoop, balance, or climb. Id. Laura cannot operate foot controls with the right foot.

Id. Laura can perform simple, routine tasks, in a job without strict production or pace

requirements, and without exposure to hazards or unprotected heights and only occasional

exposure to pulmonary irritants. Id. The ALJ determined that Laura can perform her past relevant

work as a parking lot attendant. R. 31. The ALJ also concluded that Laura could perform jobs

that exist in significant numbers in the national economy, such as mail clerk and inspector. R. 32.

Thus, the ALJ determined that Laura was not disabled. Id. Laura appealed the ALJ's decision

and the Appeals Council denied her request for review on November 18, 2019. R. 1–6.

**ANALYSIS**

Laura alleges that the ALJ failed to properly assess her mental impairments, determine

---

[5] In May 2019, the Social Security Administration rescinded and replaced SSR 02-1p with SSR 19-2p. Soc. Sec. Ruling 19-2 Titles II and Xvi: Evaluating Cases Involving Obesity, SSR 19-2p, 2019 WL 2374244 (S.S.A. May 20, 2019). The ALJ issued the decision in this case in December 2018, before the new rule. The old rules contained in SSR 02-1p therefore apply. See Williams v. Saul, No. 1:19-cv-983, 2020 WL 5802707, at *5 n.2 (E.D. Va. Sept. 29, 2020).

[6] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

her RFC using a function-by-function analysis, and assess her allegations regarding her symptoms. Laura has bipolar disorder and received frequent psychiatric treatment and counseling throughout the relevant time period for symptoms of anxiety and depression. Laura also complains of several physical symptoms, namely pain in her right ankle stemming from an earlier ankle fracture and cyclical vomiting stemming from gastroesophageal reflux disease (GERD).

### A.  Medical History Overview

1.  Physical Treatment

In June 2013, Adegbenga Bankole, M.D., diagnosed Laura with fibromyalgia. R. 483–86. She continued to treat with Dr. Bankole several times a year between 2013 and 2014. Pl.'s Br. at 4, Dkt. 14. She treated her fibromyalgia symptoms with medication throughout the relevant time period. See, e.g., R. 825.[7]

Laura suffered pain in her ankles stemming from an earlier right ankle fracture. R. 416–17. In June 2016, after twisting her ankle, she complained of increased right ankle pain and swelling. R. 419. J. Randolph Clements, DPM, recommended surgery to remove the hardware in her ankle remaining from her previous injury. R. 411, 418. After surgery in August 2016, Dr. Clements found no swelling or tenderness in Laura's ankle, and Laura participated in physical therapy, noting some pain relief. R. 353, 355–357, 399, 401. At her surgical follow-up in February 2018, Laura made generalized complaints about left heel pain and pain with walking, but she noted that her right ankle was doing well.[8] R. 1052.

---

[7] Beyond describing her fibromyalgia diagnosis, Laura did not explicitly reference fibromyalgia-related complaints in either her briefing or in her hearing testimony. See Pl.'s Br., Dkt. 14; R. 39–65.

[8] Laura made several general complaints of right and left ankle pain in 2018. she controlled pain with Tylenol. R. 1071, 1083, 1091, 1100.

Laura occasionally complained of vomiting and other gastrointestinal issues prior to her alleged disability onset date, some of which appeared connected to pregnancy. See, e.g., R. 500. In February 2016, she complained that she had vomiting symptoms for one month. R. 426. In 2017 and 2018, Laura frequently complained of vomiting, often stating that her symptoms lasted for months.[9] Her treating physicians advised that she avoid marijuana and greasy foods and recommended treating symptoms by changing the type, timing, and dosage of her medications. See R. 1065, 1076, 1082, 1321. She generally reported some relief in response to medication changes. See R. 1148, 1188, 1296, 1298. See, e.g., R. 694. In September 2018, she began treating with Kevin Dye, M.D., for gastrointestinal issues. R. 1321. He suggested switching Laura's medications and that she undergo an EGD. Id.

2. Mental Treatment

Laura was diagnosed with bipolar disorder before her alleged onset date and managed her symptoms with medication. See, e.g., R. 501. She complained of symptoms including depression and anxiety and treated biweekly at the Center for Emotional Care between March 2014 and September 2018, usually with psychiatrist Himanshu Patel, M.D., or Molly Sharp, PA–C.[10] R. 693–787, 788–94, 800–17, 1287–1311. Dr. Patel consistently rated her symptoms as mild or moderate. See, e.g., R. 787, 806, 812. Laura's treatment was consistent, although Dr. Patel occasionally changed her medication to limit side effects, especially related to her cyclical vomiting. Dr. Patel consistently reported that Laura's "[t]hought process is coherent, relevant, goal oriented," that her "immediate memory is intact, recent memory is intact," and that she "has

---

[9] She occasionally denied vomiting symptoms during this same time period. See, e.g., R. 384, 937, 982, 1296, 1298. She reported to the emergency room in April 2018 complaining of vomiting symptoms, however, medication provided symptomatic relief. R. 901.

[10] There are occasional gaps in her treatment, especially in late 2017 and early 2018. R. 26.

good attention and concentration." See, e.g., R. 810–11. Treatment notes indicate some level of anxiety and depression, however, the notes indicate that these symptoms were stable and that Laura reported some improvement over the relevant time period. See, e.g., R. 716.

Laura additionally attended outpatient counseling at Support Systems between 2017 and 2018. The counseling focused on her feelings of anxiety, depression, stress, and low self-esteem. See R. 359–77, 1110–1286. She frequently discussed issues with her boyfriend during these sessions. See, e.g., R. 371–72, 1115–16, 1123. The counselors noted varying progress in the goals set, but noted fairly consistent levels of stress, anxiety, and depression throughout treatment. See, e.g., R. 1150–60.

3. Medical Opinions

In May 2017, William Humphries, M.D., performed a consultative examination. R. 796–99. Dr. Humphries concluded that Laura "would be limited to sitting 6 hours in an 8-hour workday, standing and walking 6 hours in an 8-hour day, lifting 20 pounds occasionally and 10 pounds frequently." R. 798. He found that despite having a tender right ankle, she had no other tenderness or deformity of her lower extremities. Id. He noted some tenderness in her elbows, wrists, and hands, but found that she had no problem coordinating on and off the examination table. R. 797. Mentally, he noted she had normal memory and intelligence. Id. He also found that Laura's "statements and portrayal of symptoms are not consistent with medical signs." R. 797. The ALJ gave Dr. Humphries opinion significant weight. R. 27.

State agency physician Bert Spetzler, M.D., reviewed the record in June 2017 and found Laura capable of a limited range of light work, with certain postural, manipulative, and environmental limitations. R. 113–18. Jack Hutchinson, M.D., reviewed the record in December 2017, similarly finding Laura capable of light work with similar limitations. R. 151–57. The ALJ

gave Drs. Spetzler and Hutchinson's opinions significant weight. R. 27–28. State agency

psychiatrist Howard Leizer, Ph.D., also reviewed the record in December 2017 and found

moderate limitations. R. 153–57. He noted that her recent mental status exams were normal, and

that she is best suited for simple, unskilled work. R. 140–57. The ALJ gave Dr. Leizer's opinion

significant weight. R. 28.

### B. Mental Impairments under SSR 96–8P

Laura argues that the ALJ failed to properly assess her mental impairments as required by

SSR 96–8P. See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR

96-8P (S.S.A. July 2, 1996). Specifically, Laura asserts that the ALJ failed to properly consider

her moderate limitations in concentration, persistence, or pace and understanding, remembering,

or applying information by "not address[ing] plaintiff's ability to sustain work activity over the

course of an eight hour workday."[11] Pl.'s Br. at 24–28, Dkt. 14.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the

evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-

2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative

discussion describing how the evidence supports each conclusion, citing specific medical facts

(e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR

96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012

---

[11] Laura also states that the ALJ erred because he afforded "significant weight" to Dr. Leizer's opinion, "[but] did not explain why he did not adopt Dr. Leizer's opinion that [Laura] has moderate limitations in [interacting with others]." Pl.'s Br. at 26–27, Dkt. 14. I find no error. The ALJ expressly stated his reasons for deviating from Dr. Leizer's report noting that "[t]he fact that the claimant interacted well with three practitioners, had an active social life, and did not report problems dealing with customers constantly [at] work support the lack of limitation to her social interaction. Consequently, the undersigned has given her only a mild limitation in the B criteria area of social interaction because it is consistent with the evidence and the lack of vocationally relevant functional limitations to social interaction." R. 28; see Dunbar v. Comm'r, No. JFM-13-2091, 2014 WL 4388368, at *2 (D. Md. Sept. 4, 2014) ("An ALJ need not adopt every finding in an opinion, even if the ALJ assigns that opinion 'significant weight.'").

WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 U.S.

Dist. LEXIS 132972, at *15-16, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe v.

Colvin, 826 F.3d 176, 189, (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate

and logical bridge from the evidence to his conclusion" and holding that remand was appropriate

when the ALJ failed to make "specific findings" about whether the claimant's limitations would

cause him to experience his claimed symptoms during work and if so, how often).

In Shinaberry v. Saul, the Fourth Circuit clarified that an "ALJ cannot summarily

'account for a claimant's limitations in concentration, persistence, and pace by restricting the

hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform

simple tasks differs from the ability to stay on task.'" Shinaberry v. Saul, No. 18-2096, 2020 WL

908887, at *4 (4th Cir. Feb. 26, 2020) (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir.

2015)). However, Mascio does "not impose a categorical rule that requires an ALJ to always

include moderate limitations in concentration, persistence, or pace as a specific limitation in the

RFC." Shinaberry, 2020 WL 908887, at *4. In contrast, Shinaberry highlights "sister circuits"

who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts

for such limitations [in concentration, persistence, or pace]" when the "medical evidence

demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite

[these] limitations."  Id. (quoting  Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th

Cir. 2011)). Shinaberry further confirms that Mascio does not broadly dictate that a claimant's

moderate impairment in concentration, persistence, or pace always translates into a limitation in

the RFC, but instead underscores the ALJ's duty to adequately review the evidence and explain

the decision. See also Monroe, 826 F.3d 176 (emphasizing that the ALJ must provide a sound

basis for his ruling, including discussing what evidence he found credible and specifically applying the law to the record).

This is not a situation like <u>Mascio</u>, where the ALJ summarily concluded that a limitation to simple, unskilled work accounts for the claimant's moderate impairment in concentration, persistence and pace without further analysis. Unlike the claimant in <u>Mascio</u>, the medical evidence supports the ALJ's conclusion that, despite her moderate limitations in concentration, persistence, or pace, Laura can perform the basic mental demands of light work, with the specified accommodations. Further, here, the ALJ explained why Laura's moderate limitations in concentration, persistence, or pace, and understanding, remembering, or applying information, did not translate into a limitation in the RFC beyond "simple, routine tasks, in a job without strict production or pace requirements." R. 22.

Contrary to Laura's argument, the ALJ adequately supported his finding that Laura could sustain simple, routine tasks over a normal workday. The ALJ found that Laura had moderate impairments in concentration, persistence, or pace, noting that "this area of functioning concerns actions that demonstrate the ability to focus attention on work activities and stay on task at a sustained rate." R. 20. While the ALJ acknowledged Laura's subjective allegations that she has difficulty concentrating,[12] he concluded that her moderate limitations would not prevent her from working, and that Laura was capable of performing the basic mental demands of light work with "simple, routine tasks, in a job without strict production rate or pace requirements." R. 22–23. The ALJ noted that Laura's treating psychiatrist frequently reported that she "ha[d] good attention and concentration," and noted that she reported good control of her psychiatric symptoms with medication. R. 25–26, 30; <u>See, e.g.</u>, R. 695, 698, 701, 704, 707, 710, 713, 716

---

[12] The ALJ noted that Laura inconsistently reported issues with concentration throughout the relevant time period. <u>See</u> R. 20; <u>see also</u> R. 1194.

(treating psychiatrist's treatment notes describing good attention and concentration); R. 30, 58, 700 (showing control of symptoms with medication).[13] The ALJ also referenced Laura's activities of daily living, including, household chores, raising children, and working part-time at Sonic, which the ALJ determined "require some concentration, persistence, and pace." R. 21. The ALJ gave significant weight to state agency psychologist, Dr. Leizer, who found that Laura had moderate limitations in concentration, persistence, or pace, but that despite such limitations, she "[could] concentrate on simple, repetitive tasks."[14] R. 28, 134. Accordingly, I find that substantial evidence supports the ALJ's conclusions regarding Laura's RFC as related to her limitations in concentration, persistence, and pace.

Laura also argues that the ALJ failed to explain how the RFC accommodates her moderate limitation in understanding, remembering, and applying information. In this domain, the ALJ acknowledged Laura's subjective allegations of poor memory. R. 30. However, the ALJ noted that despite these subjective complaints, the medical records show that Laura "generally did not complain of symptoms related to understanding and remembering to treating practitioners and that her "mental status reports[] generally show[] no serious deficits in long-term memory, short-term memory, insight, and judgment." R. 20. Dr. Patel, for instance, repeatedly reported that Laura's "[t]hought process is coherent, relevant, [and] goal oriented" and that her "immediate memory is intact, recent memory is intact," and that she had "fair insight" and "fair judgment." See, e.g. R. 695, 698, 701, 704. The ALJ also emphasized that that Laura performs normal necessary household activities, such as cooking, cleaning, and shopping, and that she

---

[13] Laura's treatment providers before her alleged onset date also reported no memory problems or problems with concentration. See e.g., R. 361, 449, 456, 460.

[14] The ALJ further explained that "[t]he claimant has also been precluded with jobs with strict production or pace requirements because she testified to difficulty constantly keeping up with constant demands during five hour shifts at her current job." R. 28.

cares for two young children and works part-time at a fast food restaurant. R. 20. Thus, the ALJ

explained that the evidence suggested no more than a moderate limitation in this domain given

that these activities all "require a basic level of understanding, remembering, and applying

information." Id. The ALJ gave significant weight to Dr. Leizer, who indicated that Laura "is

able to understand and remember simple 1–2 step instructions." R. 133.

Here, the ALJ's reasoning rests on the opinions of Laura's treating psychiatrist and the

opinions of the state agency physicians, and a detailed consideration of the record evidence, and

this court is not "left to guess about how the ALJ arrived at his conclusions." Mascio, 780 F.3d at

637. As such, I conclude that substantial evidence supports the ALJ's conclusions regarding

Laura's RFC.

### C. Physical RFC and Function-by-Function Analysis

Laura argues that substantial evidence does not support the ALJ's physical RFC findings

because the ALJ failed to properly consider her impairments on a function-by-function basis.

Pl.'s Br. at 28–30, Dkt. 14. Specifically, Laura argues that the ALJ failed to make specific

findings regarding Laura's cyclic vomiting and need to frequently change positions and lie down

during the day.[15] Pl.'s Br. at 29–30, Dkt. 14.

A function-by-function analysis requires the ALJ to develop an adequate RFC which

accounts for the work activities the claimant can perform given the physical or mental

impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions

---

[15] Laura additionally argues that the ALJ failed to make specific findings regarding whether her
impairments would cause her to experience episodes of pain necessitating breaks and how often those breaks would
occur. Pl.'s Br. at 30, Dkt. 14. Laura does not point to any specific medical records to support a need for additional
breaks. Nevertheless, the ALJ adequately considered such need, noting that despite Laura's testimony, that she has
been able to maintain part-time employment at Sonic, where she is on her feet for five hours each shift and noted
"that none of [Laura's] treating practitioners placed limitations on the claimant or stated that she is unable to work."
R. 30.

reached and explain any record evidence which contradicts the RFC determination. See SSR 96–8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

In his opinion, the ALJ referenced Laura's testimony that "she sometimes has days where she vomits a lot" and that her medication does not completely resolve her issues. R. 22. The ALJ additionally discussed Laura's complaints of vomiting to treatment providers. R. 23–26. Nevertheless, the ALJ noted that Laura's complaints of cyclical vomiting were inconsistent,

noting that she "sought gastrointestinal treatment only a few times."[16] <u>See</u> R. 1321; <u>see also</u> R. 384, 937, 982, 1022, 1148, 1296, 1298 (denying symptoms of vomiting). The ALJ also stated that her treatment was conservative and namely consisted of providers' recommendations that Laura change her diet and the timing and dosage of her medication. <u>See</u> <u>e.g.</u>, R. 25, 1065, 1321. The ALJ also found that there was no evidence, beyond Laura's testimony, that such symptoms interfered with her work at Sonic. R. 30. The ALJ also gave significant weight to Dr. Humphries' consultative evaluation, where he acknowledged Laura's complaints of cyclical vomiting, but ultimately concluded that she could work with certain exertional limitations. R. 27, 798.

The ALJ also adequately considered Laura's complaints regarding her need to frequently change positions or lie down during the day. He specifically acknowledged her testimony that she gets intermittent back pain if she stands up over twenty minutes and her reports of joint and ankle pain. The ALJ found, however, that Laura engages in a number of daily activities, including caring for three children, housework, and shopping. R. 20. The ALJ also noted that Laura works part-time at Sonic, where she is on her feet for five hours at a time.[17] R. 27. The ALJ supported his analysis with medical opinions from the state agency physicians, who found that Laura could walk, sit, and stand for six hours in an eight-hour workday, and Dr. Humphries, who found that Laura had no significant problems that would prevent her from frequent walking and standing.[18]

---

[16] The ALJ noted that Laura's treating physicians suggested that her marijuana use could be contributing to her symptoms; Laura continued to use marijuana throughout the relevant time period. R. 24, 1062–65, 1076, 1082. The ALJ also noted that Laura's complaints of vomiting occasionally occurred after she failed to take her medication as directed. R. 25, 897, 913.

[17] The ALJ also cited Laura's conversation with Kenna Buck, QPPMH, where she reported "fe[eling] better when she was able to go to work . . . [and that] she felt good for being active and productive." R. 27, 1225.

[18] Laura argues that because the ALJ failed to make specific findings regarding her need to change positions and lie down that he also failed to pose proper hypothetical questions to the vocational expert ("VE"). Pl.'s Br. at 29, Dkt. 14. As discussed, the record does not support Laura's need to change positions and lie down. "While

Here, the ALJ's decision includes the narrative discussion required by SSR 96–8p and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Laura's medical records, the medical opinions, Laura's hearing testimony, and the ALJ's conclusions. R. 19–27. The ALJ's opinion specifies how the limitations in the RFC correlate with Laura's severe impairments or why no limitations are required. Accordingly, I recommend finding that substantial evidence supports the ALJ's RFC determination.

### D.  Subjective Allegations[19]

Laura argues that the ALJ's assessment of her allegations is not supported by substantial evidence. Specifically, Laura complains that the ALJ ignored or mischaracterized evidence about her depression and anxiety, right ankle strength, and cyclical vomiting. Pl.'s Br. at 32, Dkt. 14. Laura also asserts that the activities of daily living the ALJ referenced to support his finding that

---

questions posed to the vocational expert must fairly set out all of the claimant's impairments, the questions need only reflect those impairments supported by the record." Russell v. Barnhart, 58 Fed. App'x 25, 30 (4th Cir. 2003); see also Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (holding that hypothetical questions are adequate if they reflect a RFC for which the ALJ had substantial evidence). Thus, given that substantial evidence supports the ALJ's decision, the questions posed to the vocational expert, which accounted for a person of Laura's age, education, and work background who is capable of performing light exertional work with all of the limitations included in the ALJ's RFC were adequate.

[19] Laura's case is distinguishable from the Fourth Circuit's recent Arakas decision, where the ALJ erroneously relied on the lack of objective medical evidence as one of multiple factors to discount the claimant's subjective complaints regarding symptoms of fibromyalgia and thereby "effectively required" objective evidence. See Arakas v. Comm'r, No. 19–1540, 2020 WL 7331494 (4th Cir. Dec. 14, 2020). Laura does not specifically reference fibromyalgia in her subjective allegations argument. See Pl.'s Br. at 29–34, Dkt. 14. She makes one reference to objective evidence that "posterior tibial pulses were thread on the right and deep tendon reflexes were diminished in the knees, ankles, and upper extremities," however, this statement refers back to the consultative examiner's objective findings—not Laura's subjective allegations. Further, in Arakas, the claimant had long-term, serious complaints about fibromyalgia symptoms and pain to the point where both treating physicians and state agency consultants suggested potential interference with claimant's ability to work. Here, Laura's subjective complaints focused on her other severe impairments: depression, anxiety, cyclic vomiting, and right ankle pain. Laura does not assert that the ALJ improperly relied upon objective evidence to discount her fibromyalgia symptoms, and I find not such error by the ALJ in this decision.

Laura is not disabled do not actually show she is capable of completing an eight-hour workday, including working at Sonic, caring for her children, driving, shopping, and completing household chores. Id. Laura points to her own testimony that she works only part time, that her fiancée helps her take care of her children, that her case worker drives her to the grocery store and helps her shop, and that her fiancée and children assist her with household chores.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, [20] SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[21] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by

---

[20] In March 2016, the Social Security Administration superseded the language of SSR 96-7P when it ruled in SSR 16-3P that "credibility" is not appropriate terminology to be used in determining benefits. See Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Mar. 16, 2016) (effective March 28, 2016).

[21] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

The ALJ's opinion includes a discussion of Laura's medical history, along with Laura's own allegations, and the ALJ adequately supported his findings that Laura's allegations were not entirely consistent with the medical evidence and other evidence in the record. The ALJ noted Laura's testimony regarding cyclic vomiting, consistent pain in her ankle, intermittent wrist, back, and heel pain and her limitations with lifting, walking, and sitting. R. 22. The ALJ also specifically noted her complaints of anxiety and depression.  R. 22–23.

Regarding Laura's cyclic vomiting, the ALJ acknowledged that Laura reported she still has issues with vomiting even on medication and that her symptoms prevent her from working. R. 22. The ALJ noted, however, that Laura "sought gastrointestinal treatment only a few times, and there is no evidence it interfered with her working at Sonic." R. 30. The ALJ also noted that her treatment was conservative, namely including recommendations she avoid using marijuana, eat less greasy food, and change the timing and dosage of her medication. R. 25. And, despite Laura's report that she still has issues, there is some evidence in the medical record that recent changes in medication provided symptom relief. See, e.g., R. 897, 904, 937, 982, 1022, 1148, 1188, 1296, 1298 (showing instances where Laura either denied symptoms, reported symptom relief, or reported that symptom onset resulted from failure to take medication). The ALJ also cited to Dr. Humphries consultative exam where he acknowledged Laura's complaints, but did not suggest any potential interference with her ability to work. Similarly, the ALJ acknowledged Laura's complaints related to her right ankle pain, specifically her testimony that "she has pain in her ankle all the time" and that working at Sonic makes her ankle hurt. R. 22–23. He also gave a thorough history of Laura's ankle treatment. R. 24. The ALJ found that Laura reported her ankle

17

pain largely resolved by January 2017 and that, after that point, she did not seek much treatment. See R. 30, 1052; see also R. 1100, 1094, 1086 (reports of ankle pain in 2018).[22] The ALJ also gave significant weight to Dr. Leizer, who found that Laura "is capable of light work despite her physical impairments." R. 126. The ALJ finally found that evidence regarding Laura's activities of daily living further support the conclusion that she is capable of light work. R. 29.

In the same vein, the ALJ acknowledged Laura's symptoms of depression and anxiety, specifically noting Laura's testimony that her medications stabilize, but do not completely eliminate, her symptoms of anxiety and depression. R. 22–23. The ALJ noted that despite her anxiety and depression, she was consistently rated by her psychiatrist as having only "moderate symptoms."[23] R. 25. He also noted that she did report some improvement over time. R. 25; see also R. 700, 778, 781, 789, 1062. (describing either no change in symptoms or improvement in anxiety and depression). Additionally, the ALJ relied on the medical opinion of Dr. Leizer, who found that she usually had normal mental status evaluation results and was capable of simple, unskilled work, and Laura's counselors, who suggested she continue engaging in positive activities. R. 28, 30.

Laura also points to Brown, 873 F.3d 251, to support her argument that the ALJ does not explain how her various activities of daily living show that she can complete a full workday. Pl.'s Br. at 31–32, Dkt. 14. However, this case is distinguishable from Brown, where the Fourth

---

[22] Laura's treatment for her ankle, after the removal of hardware, was conservative. Her treating physicians suggested physical therapy and prescribed medication. Her treating physicians noted that she did not comply with their instructions to wear a weightbearing boot during her recovery.

[23] Laura specifically takes issue with the ALJ's statement that "the treatment notes of her treating practitioners usually showed that [her] mental status was normal at appointments except for routine findings, such as depressed or anxious mood, which would not be expected to cause significant functional limitations," noting that "depressed and anxious mood are not 'routine findings' and instead document abnormal findings." R. 30; Pl.'s Br. at 32, Dkt. 14. Despite the ALJ's choice of language, his point that her symptoms of depression or anxiety would not cause significant functional limitation is supported by substantial evidence, as described above.

Circuit concluded that the ALJ had committed multiple errors, including failing to acknowledge

the extent of the daily activities of living, writing:

> With respect to the first reason for the adverse credibility finding, the ALJ noted
> that Brown testified to daily activities of living that included "cooking, driving,
> doing laundry, collecting coins, attending church and shopping." See Second ALJ
> Decision 11. The ALJ did not acknowledge the extent of those activities as
> described by Brown, e.g., that he simply prepared meals in his microwave, could
> drive only short distances without significant discomfort, only occasionally did
> laundry and looked at coins, and, by the time of the second ALJ hearing, had
> discontinued regular attendance at church and limited his shopping to just thirty
> minutes once a week. Moreover, the ALJ provided no explanation as to how those
> particular activities—or any of the activities depicted by Brown—showed that he
> could persist through an eight-hour workday.

873 F.3d at 263. Here, unlike in Brown, the ALJ clearly understood the limited extent to which

Laura completed her activities of daily living, including specifically acknowledging that Laura

reported she only worked part-time (around fifteen hours a week) and that while she does

household chores and other activities that, "she has to take breaks" and receives assistance from

her fiancé.[24] R. 23. Further, unlike in Brown, the ALJ pointed to more than those daily activities

to discount Laura's subjective allegations.[25] Beyond these activities of daily living, the ALJ

noted that, regarding her mental symptoms, that her treating psychiatrist often rated her

symptoms as moderate and that she was often described by her treating psychologist as having a

euthymic mood and appropriate affect. R. 26, 30; see e.g., 695, 698, 701 (describing Laura's

mood as euthymic). Laura's allegations of disability due to mental symptoms were also

inconsistent with the conclusion of the state agency doctor. R. 28. Similarly, regarding her

---

[24] The ALJ also referenced that "[t]he claimant handled her own activities of daily living without
significant assistance from others," likely in reference to Laura's report that she receives support from her case
worker at Support Systems, her fiancée and her children. R. 21.

[25] Also, unlike in Brown, the ALJ here did not fail to consider any doctor's opinions, or wrongly credit a
psychiatric medical expert's testimony over the "consistent opinions of [five] treating and examining sources" who
found disabling physical limitations. Brown, 873 F.3d at 266.

physical symptoms, the ALJ noted that Laura's allegations of disability were inconsistent with

the conclusions of the state agency doctors and the consultative examiner. R. 27. The ALJ also

noted, regarding her ankle and cyclic vomiting, that Laura did not seek consistent treatment. R.

30. Finally, the ALJ may properly rely on evidence regarding a claimant's routine, non-work

activities in rejecting a claim of disability. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir.

2005).

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies

between a claimant's alleged impairments and his ability to work.  See Smith v. Chater, 99 F.3d

635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984)

(finding that because the ALJ had the opportunity to observe the demeanor and to determine the

credibility of the claimant, the ALJ's observations concerning these questions are to be given

great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will

not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of

Laura's subjective complaints with substantial evidence, and that Laura can perform work at the

level stated in the ALJ's opinion.

## CONCLUSION

I **RECOMMEND** that an order be entered **AFFIRMING** the final decision of the

Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's

motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Michael F. Urbanski, United

States District Judge, and to provide copies of this Report and Recommendation to counsel of

record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any

objections to this Report and Recommendation within fourteen (14) days.  Any adjudication of

fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered:  February 17, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge